UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                        :     05 CV 357 (ARR)

MICHAEL TARR,                           :

                    Plaintiff,       :     <u>NOT FOR</u>
                                            :     <u>PRINT PUBLICATION</u>
    -against-                       :
                                            :     <u>OPINION AND ORDER</u>

JO ANNE B. BARNHART,              :
Commissioner of Social Security,      :
                                          :
                  Defendant.       :
                                          :
------------------------------------------------------------------- X

ROSS, United States District Judge:

Plaintiff Michael Tarr brought this action pursuant to 42 U.S.C. §§ 405(g) to review defendant Commissioner Barnhart's adoption of the decision of Administrative Law Judge ("ALJ") Kahn that plaintiff was not disabled on or before March 31, 1997, the date on which plaintiff was last insured under the Social Security Act ("the Act"), and is therefore not entitled to disability insurance benefits. Plaintiff initiated this action by complaint filed on October 4, 2004. Defendant has moved for judgment on the pleadings pursuant to Rule 12(c). Plaintiff has cross-moved for judgment on the pleadings. For the reasons stated below, the court denies defendant's motion for judgment on the pleadings and grants plaintiff's motion for judgment on the pleadings. The court therefore reverses the Commissioner's decision, and remands the case to the Commissioner solely for the calculation of benefits.

**BACKGROUND**

**A.    Procedural History**

Mr. Tarr applied for DI benefits on April 11, 1994, alleging disability since January 3, 1992 (R. 80-82)[1] due to back, neck, and knee injuries (R. 83, 88, 95-111) and mental impairments (R. 88, 103, 107, 120-132).  His application was denied initially and upon reconsideration.  R. 84-86, 89-91.  Plaintiff requested and was granted a hearing before an ALJ.  R. 39.  This hearing took place before ALJ Esteban Pizaro de Jesus on September 14, 1995.  R. 41-79.  By decision dated December 4, 1995, ALJ de Jesus found that plaintiff was not disabled.  R. 17-32.  ALJ de Jesus concluded that plaintiff suffered from severe impairments which did not meet or equal the severity of listed impairments.  R. 24. Although these impairments precluded him from performing his past relevant work, the ALJ found that plaintiff retained the residual functional capacity ("RFC")[2] to perform light and sedentary work in which he was allowed to alternate positions.  R.  26-27.  The Appeals Council denied Mr. Tarr's request for review on May 13, 1997.  R. 6-7.  Mr. Tarr filed a civil complaint in this court on July 11, 1997.  See Tarr v. Callahan, E.D.N.Y. No. 97-CV-3971 (RR).  By stipulation of the parties, the matter was remanded back to the Commissioner for further administrative proceedings on January 22, 1998.  See id.; R. 223-24.

---

[1] "R." refers to the administrative record filed with the court by defendant Commissioner.

[2] The Social Security Administration ("SSA") regulations define "residual functional capacity" as an individual's maximum remaining ability to do sustained work-related activities in a work setting on a regular and continuing basis, after taking into account the effects of the individual's medically determinable impairment(s).  See 20 C.F.R. § 416.945; Social Security Ruling ("SSR") 96-8p, "Titles II and XVI: Assessing Residual Functioning Capacity in Initial Claims," 1996 SSR LEXIS 5, at *5.

On remand, a hearing took place before ALJ David Z. Nisnewitz on August 12, 1998.  R. 519-617B.  By decision dated October 7, 1998, ALJ Nisnewitz found that plaintiff was not disabled because he was able to perform his past relevant work as a supermarket manager at all points prior to March 31, 1997, the date on he was last insured ("DLI") for disability insurance benefits.  R. 387-407.  Specifically, ALJ Nisnewitz found that plaintiff had several impairments – back, neck, and knee pain and an anxiety disorder – which caused vocationally relevant limitations but neither met nor equaled in severity any of the listed impairments.  R. 392.  ALJ Nisnewitz concluded that, as of March 31, 1997, plaintiff retained the residual functional capacity to perform work at the light exertional level.  R. 393, 399.  Although ALJ Nisnewitz noted that plaintiff's capacity to do a full range of light work might be "somewhat diminished" by postural limitations and a "mild decrease in his ability to concentrate for prolonged periods," he determined that plaintiff was able to return to his past work as a supermarket clerk or assistant night manager.  R. 400-401.

Following this decision, plaintiff's attorney submitted several letters and additional medical evidence.[3]  R. 409-451.  The Appeals Council assumed jurisdiction, and found that the additional medical evidence suggested that the ALJ may have underestimated the impact of plaintiff's mental impairments on his "ability to perform mental work-related functions."  R. 454.  On March 4, 2000, the Appeals Council remanded the matter to an ALJ for further

---

[3]The court notes that it is unclear whether the medical evidence referenced in and submitted with plaintiff's attorney's letters to the Appeals Council had been previously submitted to the SSA.  Plaintiff's attorney's letter suggests that at least the March 1993 evaluation by Dr. Berczeller, the October 1993 evaluation by Ms. Monson, and the March 1993 evaluation by Dr. Jones were part of the SSA record prior to the August 1998 hearing.  R. 409-411. The Appeals Council's order remanding the case for a new hearing, however, implies that these reports – and the 1998-1999 psychiatric and psychological evaluations – were all new evidence.  R. 453-454.

evaluation of the severity of plaintiff's mental impairments and any resulting limitations on his ability to work. R. 452-454.

A third hearing was held on February 14, 2001, again before ALJ Nisnewitz. R. 618-694. Medical expert Dr. Harvey Bluestone testified at this hearing. R. 618, 685-687, 693. By decision dated December 28, 2001, ALJ Nisnewitz again concluded that the plaintiff had not been disabled prior to the date on which he was last insured. R. 481-494. ALJ Nisnewitz summarized various psychiatric and psychological evaluations of plaintiff and the resulting diagnoses and vocational limitations (R. 486, 488-489), before inconsistently concluding that "there is no documentation of an ongoing psychiatric condition" which affected plaintiff on or before March 31, 1997. R. 491. ALJ Nisnewitz found that plaintiff was unable to perform his past relevant work but, based upon his finding that the plaintiff could perform sedentary work and had no nonexertional limitations, concluded that Medical-Vocational Rule 201.21, Appendix 2, Subpart P, Regulations No. 4 directed a finding that the plaintiff was not disabled. R. 492-494.

On June 4, 2002, the Appeals Council assumed jurisdiction and vacated ALJ Nisnewitz's decision. R. 501-504. The Appeals Council stated that ALJ Nisnewitz's decision with respect to plaintiff's mental condition was "inconsistent and does not provide an appropriate mental status evaluation." R. 502. The Appeals Council remanded the matter to a different ALJ for (a) further evaluation of plaintiff's mental impairments in accordance with the technique described in 20 C.F.R. 404.1520a and the appropriate medical criteria, (b) further consideration of plaintiff's residual functional capacity, and (c) consideration of evidence from a vocational expert

regarding the effect of plaintiff's functional limitations on his ability to perform jobs which exist in sufficient numbers in the national economy.  R. 503.

A fourth hearing was held on November 4, 2002 before ALJ Martin Kahn.  R. 695-745. Vocational expert Andrew Pasternak testified at this hearing.  R. 695, 729-745.  By decision dated February 7, 2003, ALJ Kahn found that plaintiff was not disabled prior to the expiration of his insured status on March 31, 1997, because plaintiff retained the functional capacity to perform a reduced range of sedentary work ("simple, low stress sedentary work").  R. 208-221. On December 4, 2004, the Appeals Council declined plaintiff's request for review, making ALJ Kahn's February 7, 2003 decision the final decision of the Commissioner of Social Security.  R. 187-89.  The instant action was timely commenced.

**B.**      **Plaintiff's Age, Education, and Work History**

Plaintiff was born on February 4, 1969.  R. 80.  He was twenty-two years old at the alleged onset of his disability (January 3, 1992); twenty-five years old when he applied for disability insurance benefits on April 11, 1994; twenty-eight years old when his disability insured status expired on March 31, 1997; and thirty-three years old at his fourth and final ALJ hearing on November 4, 2002.  R. 80, 92, 697.  On the date of this decision, plaintiff is thirty-seven years old.  Plaintiff is not married, has no children, and lives with his father.  R. 698-99.

Plaintiff attended the Lowell School from second grade through graduation.  R. 283-374. The Lowell School is a private special education school approved by the Office of Vocational and Educational Services for Individuals with Disabilities (VESID) of the New York State Education Department for children with emotional disturbances, learning disabilities, and speech

and language impairments.[4]  The NYC Board of Education classified plaintiff as "emotionally disturbed."  R. 299.  Plaintiff's Individualized Education Program (IEP) recommended that he be placed in a "small, highly-structured class within a small school setting geared to youngsters who have difficulty with self-esteem, relating to others, and coping with the demands of an academic program."  R. 291.  While at the Lowell School, plaintiff received counseling from a psychologist twice a week.  R. 698.  Plaintiff graduated from the Lowell School in 1987.  R. 99.

Between 1986 and January 1992, plaintiff worked at Grand Union as a cashier, a stock person, and a member of the night stocking crew, and worked briefly in the receiving department at Toys 'R Us.  R. 99, 110, 699-704.  Plaintiff worked as a crew chief "off and on" during his last three and a half years at Grand Union.  R. 700.  Plaintiff had difficulty getting along with co-workers and supervisors at both Grand Union and Toys 'R Us.  For example, plaintiff was demoted and transferred to a different Grand Union store after having "fought" with a coworker (R. 700-701), quit working at Grand Union following another altercation with a coworker (R. 704), and left his job at Toys 'R Us due to a "disagreement with the supervisor" (R. 704).  Plaintiff also had trouble interacting with customers.  R. 559, 668-671, 722.

C.    **Plaintiff's Medical History**

ALJ Kahn concluded that, prior to the expiration of his insured status, plaintiff retained the residual functional capacity to perform "sedentary work reduced by additional limitations."  R. 218.  Although it is clear that ALJ Kahn decided that plaintiff was limited to sedentary work due to his physical impairments, the ALJ did not specify whether the "additional limitations"

_____

[4]See "Approved Private, Special Act, State Operated and State Supported Schools in New York State," VESID, at http://www.vesid.nysed.gov/specialed/privateschools/.

resulted from plaintiff's physical impairments, mental impairments, or both physical and mental impairments. R. 213-218, 732. Because it is possible to resolve this case without evaluating whether plaintiff's physical impairments limited his occupational base to something less than the full range of sedentary work, I will only briefly describe plaintiff's physical impairments before summarizing the medical evidence related to plaintiff's mental impairments.

### 1.     *Physical Impairments*

Plaintiff injured his back and his left knee in a work-related accident in 1989. R. 95, 144. He stopped working on January 3, 1992 in order to have knee surgery. R. 95. Plaintiff had two operations on his left knee in 1992: an operative arthroscopy on January 15, 1992 and a meniscectomy on May 15, 1992. R. 154, 158, 151. Plaintiff also injured his back and neck in a motor vehicle accident in March 1992. R. 158. MRIs and electrodiagnostic examinations conducted in October and December of 1992 suggested disc bulging at L5-S1, bilateral L5-S1 radiculopathy, and left L4-L5 radiculopathy. R. 144-148.

Based upon his review of the medical evidence relating to plaintiff's physical impairments, ALJ Kahn concluded that plaintiff "is status post left knee arthroscopy, and has back and neck pain impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Part P, Regulations No. 4." R. 216. The medical evidence illustrates that, at a minimum, plaintiff had difficulty standing and walking for prolonged periods of time, and lifting and carrying heavy objects. R. 214, 160, 168. As a result, ALJ Kahn concluded that, prior to the expiration of his

insured status, plaintiff retained the residual functional capacity to perform "sedentary work reduced by additional limitations."  R. 218.


2.    *Mental Impairments*

**Emery Berczeller, M.D., Consulting Psychiatrist – March 3, 1993**

Dr. Berczeller conducted a psychiatric evaluation of plaintiff for VESID on March 3, 1993.  R. 412.  Dr. Berczeller diagnosed plaintiff with a developmental disorder, not otherwise specified,[5] intermittent explosive disorder,[6] and paranoid personality disorder,[7] and noted that plaintiff "most likely has some brain damage" and should be given a neurological assessment.  Id.  Dr. Berczeller reported that plaintiff has a history of hyperactivity and temper tantrums as a child, minimal brain dysfunction, and learning disabilities.  Id.  In assessing plaintiff's mental status, Dr. Berczeller noted that plaintiff has a short temper and is argumentative.  Id.  Dr. Berczeller also observed that plaintiff has a "cocky attitude, tainted with suspicious, paranoid flavor" and "does not trust people, has no friends, [and] stays home."  Id.  Dr. Berczeller

---

[5]A diagnosis of "developmental disorder, not otherwise specified" is appropriate "when there is severe and pervasive impairment in the development of reciprocal social interaction associated with impairment in either verbal or nonverbal communication skills or with the presence of stereotyped behavior, interests, and activities," but where the criteria for more specific disorders are not met.  Pl.'s Mem., 9 (citing Diagnostic & Statistical Manual of Mental Disorders (4th ed. 2002) (hereinafter "DSM-IV") at 84).

[6]Intermittent explosive disorder (DSM-IV 312.34) is characterized by "[s]everal discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property," in which the "degree of aggressiveness. . . is grossly out of proportion to any precipitating psychosocial stressors" and the aggressive episodes are not better accounted for by another mental disorder (e.g., a manic disorder or ADHD) or the physiological effects of a substance or a general medical condition.  "Impulse-Control Disorders Not Elsewhere Classified," DSM-IV.

[7]Paranoid personality disorder (DSM-IV 301.00) is characterized by "pervasive distrust and suspiciousness of others such that their motives are interpreted as malevolent, beginning by early adulthood and present in a variety of contexts," which does not occur exclusively during the course of a mood disorder with psychotic features or due to an otherwise identifiable medical condition.  "Personality Disorders," DSM-IV.

concluded that "[b]ecause of his paranoid, self-righteous attitude, [plaintiff] has difficulties in adjusting to working situations... He cannot tolerate pressure. He is prone to at least verbal explosion." Id.


**Louis Jones, Ed.D., Consulting Psychologist – March 5, 1993**

Dr. Jones conducted a psychological evaluation of plaintiff for VESID on March 5, 1993. R. 417-420A. Dr. Jones administered numerous standardized tests (e.g., Wechsler Adult Intelligence Scales, California Achievement Tests in Reading Comprehension, Bender Motor Gestalt Test) and conducted a mental status examination. Id.

Based upon the standardized tests, Dr. Jones concluded that plaintiff's IQ was 94, his reading comprehension skills were between eighth and tenth grade levels, his arithmetic ability was at the ninth grade level, and his written expression skills were at a fourth or fifth grade level. R. 418-420. Plaintiff's performance on the WAIS-R indicated that he falls into the "low normal" cognitive range. R. 419. Notably, plaintiff's performance on test sections related to social judgment fell in "the range usually found with persons in the borderline cognitive category." Id. Dr. Jones also observed that plaintiff demonstrated only "fair to poor understanding of interpersonal problems and limited intuitive ability to empathize with others' feelings." R. 420. Plaintiff demonstrated "good" fine manual dexterity, but his Bender protocol suggested the presence of "mild organically based perceptual-motor difficulty." Id.

Dr. Jones described plaintiff as hyperactive, anxious, emotionally labile, and easily irritated. R. 420-421. He noted that plaintiff "tends to talk volubly in a driven manner" and was

"very talkative." Id.  Based upon the results of the standardized tests and his mental status

evaluation, Dr. Jones diagnosed plaintiff with organic personality syndrome.[8]

Dr. Jones noted that the occupations in which plaintiff had expressed interest, computer

programming and computer repairs, "might be within his ability levels, but seem[] somewhat

problematic in view of his apparent organically based personality condition."  R. 420A.  Dr.

Jones repeatedly expressed concern that, due to plaintiff's physical and mental impairments, he

would be unable "to cope with the demands of highly pressured competitive training or work"

and would "require some support in his training or work setting."  R.420-420A.  He concluded

that,

> With supportive supervision, Mr. Tarr might be able to function adequately in
> some kinds of clerical, light manual or service trades of moderate complexity in a
> low pressure setting. . .  Eventual competitive employment might be possible for
> Mr. Tarr, if appropriate placement can be found for him in a low pressure setting
> with fairly close, supportive supervision.

R. 420A.

---

[8]The DSM-III characterized organic personality syndrome as "[p]ersistent disturbance, whether lifelong or representing a change in accentuation of a previous characteristic trait, involving at least one of the following: (1) affective instability, (2) recurrent outbursts of aggression or rage that are grossly out of proportion to any precipitating psychosocial stressors, (3) markedly impaired social judgment, (4) marked apathy and indifference, (5) suspiciousness or paranoid ideation," where the history, examination, or laboratory tests revealed "a specific organic factor judged to be etiologically related to the disturbance."  Pl.'s Mem, 10 (citing Quick Reference to Diagnostic Criteria from DSM-III-R, 82-83).

The court notes that the DSM-IV eliminated the term "organic," because it created the incorrect impression that "nonorganic" or "functional" mental disorders were unrelated to physical or biological factors or processes.  See "Use of the Manual," DSM-IV.  The disorder that was called "organic personality syndrome" in the DSM-III is referred to as "personality syndrome due to a general medical condition" in the DSM-IV.  Id.

**Leslie J. Monsen, MS, CRC, Consulting Vocational Evaluator[9] – Fall 1993**

Ms. Monsen conducted a diagnostic vocational evaluation of plaintiff for VESID in the fall of 1993.  R. 413-417.  She interviewed plaintiff, observed his interactions with program staff and participants, and conducted academic testing, aptitude testing, interest testing, and situational assessments in the career areas of electronics technician and clerical/business skills. Id.

Ms. Monsen described plaintiff as "an argumentative individual, who was pessimistic and negative," "curt," and "impolite."  R. 414-415.  He provoked staff and program participants with sarcastic remarks and interrupted others frequently.  R. 414.  Ms. Monson noted that plaintiff was "rarely" sociable, and stated that "as time progressed people avoided Mr. Tarr."  Id.

Plaintiff was found to have "very strong academic skills;" his vocabulary, language mechanics, language expression, and math computation skills were at the 12.9+ grade level, and his reading comprehension and math concepts and applications skills were at the eleventh grade level.  R. 414A.  Plaintiff performed clerical tasks well; however, he did not do well on typing, DOS, and computer programming aptitude tests.  R. 414A-415.  Ms. Monsen also noted numerous "vocational limitations."  R. 414A.  Plaintiff had trouble with spelling and punctuation, and was unable to understand and process technical information.  Id.  His abstract reasoning skills were weak, and he "was unable to solve problems by evaluating arguments, making deductions, making inferences, recognizing assumptions, and interpreting information." R. 414A-415.

---

[9]Although Ms. Monsen is not a medical expert, a summary of her evaluation and recommendations is included here because the ALJ referred to her evaluation in his decision.

Plaintiff performed well on the electronics technician situational assessment, but had significant difficulty with the clerical situational assessment; he was unable to follow instructions, did not ask for help when he was confused, and was argumentative and defensive when his mistakes were corrected. R. 415. Similarly, he made frequent errors on cash and sales recordkeeping exercises but "argued and insisted he was correct" when mistakes were pointed out to him. Id. As a result, Ms. Monsen stated that plaintiff's work needed to be monitored. Id.

Ms. Monsen felt that plaintiff should not pursue his stated areas of vocational interest, radiological technologist (x-ray technologist) and computer programming. R. 416. She concluded that plaintiff would be physically unable to work as a radiological technologist, since that occupation involves significant standing, walking, pulling, and pushing. Id. Plaintiff's low academic and aptitude test scores in related areas precluded computer programming training. Id. Ms. Monsen suggested that plaintiff consider training as an electronic technician. Id. Alternatively, although plaintiff "does not know business procedures as well as he had stated" and "made many errors in his work," he "does possess basic clerical skills which could be developed in a business school setting." Id. However, Ms. Monsen noted that she "strongly urged that mandatory participation in therapy be a prerequisite to [plaintiff's] acceptance and continuance of training" at a vocational rehabilitation center. Id. (emphasis in original).

**A. Nahas, M.D., Consulting Psychiatrist – September 23, 1994**

Dr. Nahas conducted a psychiatric evaluation of plaintiff on September 23, 1994 at the request of the SSA. R. 164-166. Dr. Nahas noted that plaintiff was treated by a psychiatrist from ages five to fourteen, took medications for hyperactivity (Mellaril and Cilert) as a child,

and had attended a special education school due to a disability. R. 164. Based on a mental status examination, Dr. Nahas found no evidence of increased psychomotor activity, agitation, blocking, circumstantiality, psychotic thinking disorder, visual or auditory hallucinations or delusions, loosening of association, flight of ideas, paranoid delusions, depression, suicidal ideation or attempts, or homicidal ideation. R. 164-165.

However, plaintiff "showed evidence of explosive behavior" and was "uncooperative and angry." Id. His affect was labile, and his general mood was "angry and suspicious." R. 165. Dr. Nahas concluded that plaintiff's judgment and insight were impaired, and that his concentration was mildly impaired. Id. Dr. Nahas diagnosed plaintiff with anxiety disorder, not otherwise specified,[10] and attention deficit disorder[11] in remission. Id.

Dr. Nahas informed the SSA that plaintiff was able to follow directions, make decisions, and utilize old learning skills, but "is incapable of dealing with peers." Id. Dr. Nahas also noted that plaintiff's physical impairments could negatively impact his mental condition: "Potential for deterioration is dependent on the development of his primary physical illness." Id. Dr. Nahas recommended that plaintiff receive "supportive individual psychotherapy" and vocational

---

[10]A diagnosis of "anxiety disorder, not otherwise specified" (DSM-IV 300.00) is appropriate when an individual has prominent anxiety or phobic avoidance but does not meet the criteria for a specific anxiety disorder, when there is inadequate or contradictory information about symptoms, or when the clinician cannot determine whether the anxiety disorder is the primary disorder or is secondary to another medical condition. See "Anxiety Disorders," DSM-IV. The DSM-IV cautions that generalized anxiety is "a common associated feature of Mood Disorders and Psychotic Disorders." Id.

[11]Attention deficit/hyperactivity disorder (DSM-IV 314.xx) is characterized by "a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development," which results in "clear evidence of interference with developmentally appropriate social, academic, or occupational functioning" in at least two settings (e.g. home and school or work), but "is not better accounted for by another mental disorder (e.g., a Mood Disorder. . .)." See "Disorders Usually First Diagnosed in Infancy, Childhood, or Adolescence," DSM-IV.

training, but cautioned that plaintiff's poor performance at a previous training program and "his low frustration tolerance and explosive behavior might hinder this training." R. 166.

**Carlton Blake, M.D., Treating Psychiatrist – Beginning March 1998**

Psychiatrist Dr. Blake has treated plaintiff since March 1998. R. 437-445, 651-652. Plaintiff first visited Dr. Blake on March 27, 1998, seeking treatment for his perceived attention deficit disorder. R. 442. On that date, Dr. Blake took a complete psychiatric history, assessed plaintiff's mental status, and diagnosed him with bipolar disorder.[12] R. 442-443.

In his initial Psychiatric Consultation Report, Dr. Blake summarized plaintiff's medical history, including his childhood history of spina bifida, asthma, learning disabilities, perceptual impairments, and "minimal brain dysfunction." R. 442. Dr. Blake noted that plaintiff saw a psychiatrist for eight years (ages six to fourteen) due to "extreme hyperactivity" and a suicidal gesture, and that plaintiff was treated with Mellaril and Cylert. Id. After that time, plaintiff received weekly counseling at school. Id. Plaintiff reported difficulty relating to other children. Id. Plaintiff abused alcohol for two years, beginning at age 17, because he believed that it reduced his hyperactivity, but has abstained from alcohol since Thanksgiving 1997. R. 442-443. Dr. Blake noted that plaintiff described "extreme hyperactivity and mood instability in which he is either severely depressed or hypomanic. Hypomania is characterized by racing thoughts,

---

[12]Bipolar disorders (which include bipolar I disorder, bipolar II disorder, cyclothymic disorder, and bipolar disorder not otherwise specified) are mood disorders characterized by the presence of manic, mixed, or hypomanic episodes and the presence or history of major depressive episodes. See "Mood Disorders," DSM-IV. A diagnosis of "bipolar I disorder – most recent episode hypomanic" (DSM-IV 296.40) is appropriate for an individual who (a) is currently (or was most recently) in a hypomanic episode; (b) has previously had at least one manic or mixed episode; and (c) has mood symptoms which cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. Id.

impulsivity, rapid speech, and marked irritability.  Depressions are characterized by poor

concentration, sleep impairment, irritability, and social withdrawal."  Id.  Dr. Blake further noted

plaintiff's significant family history of mental illness; his mother was manic depressive and his

father had an affective illness.  R. 442.

Based upon a mental status exam, Dr. Blake concluded that plaintiff was "hyper-alert and

hypervigilant," but well-oriented.  R. 443.  Plaintiff's affect was labile, his mood was "elated,"

and he was "effusive and inappropriately jovial."  Id.  Although his memory was intact, his

retention, immediate recall, concentration, and attention span were mildly impaired.  Id.  Plaintiff

displayed no loosening of associations, hallucinations, or delusions, and his abstraction ability

was intact.  Id.  However, his judgment was impaired and his insight was "superficial."  Id.

Dr. Blake diagnosed plaintiff with bipolar disorder, and determined that plaintiff was in a

hypomanic phase[13] at the time of the evaluation.  Id.  He noted that plaintiff was also affected by

"severe psychosocial stressors."  Id.  Using the Global Assessment of Functioning (GAF) scale,

Dr. Blake rated plaintiff's overall level of functioning at that time as a GAF of 55, which

indicates that plaintiff had moderate symptoms or moderate difficulty in social, occupational, or

school functioning.[14]  Id.; see also "Multiaxial Assessment," DSM-IV.  Dr. Blake estimated that

---

[13]A hypomanic episode is a "distinct period of persistently elevated, expansive, or irritable mood" which
lasts at least four days, is clearly different from the person's usual mood, and is accompanied by three or more of the
following symptoms: (1) inflated self-esteem or grandiosity, (2) decreased need for sleep, (3) more talkative than
usual or pressure to keep talking, (4) flight of ideas or subjective experience that thoughts are racing, (5)
distractibility, (6) increase in goal-directed activity or psychomotor agitation, (7) excessive involvement in
pleasurable activities that have a high potential for painful consequences.  "Mood Disorders," DSM-IV.

[14]A GAF rating, often reported on Axis V of a multiaxial assessment, reflects a clinician's judgment of the
individual's overall level of psychological, social, and occupational functioning.  The GAF rating does not include
functional impairments due to physical or environmental limitations.  The GAF scale ranges from 0 to 100.  A GAF
rating between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers
or co-workers)."  "Multiaxial Assessment," DSM-IV.

plaintiff's highest level of sustained function during the last year had been a GAF of 65, indicating mild symptoms or some difficulty in social or occupational functioning. R. 443; see also "Multiaxial Assessment," DSM-IV.

Dr. Blake referred plaintiff to Pride of Judea for pharmacotherapy with a mood stabilizer such as Depakote and psychotherapy. R. 443. Plaintiff was evaluated by Dr. Inga Weil at Pride of Judea in June 1998 (see infra, p.19). R. 380-382. Plaintiff was apparently treated at Pride of Judea for several months. However, plaintiff was referred back to HIP in August 1998[15] and has seen Dr. Blake every three to four weeks thereafter. R. 440

On September 11, 1998, plaintiff reported impaired sleep, hypomanic symptoms, and violent impulses. Id. Dr. Blake noted that plaintiff had "very evident" mood swings, his speech was rambling, and he was actively suppressing "fears of impulses of a violent and murderous nature." Id. Dr. Blake prescribed 500 mg of Depakote, a mood stabilizer, to be taken at night. Id. On September 21, 1998, plaintiff complained of an "increase in rage and temper outbursts" and reported continued violent impulses to harm others. Id. Dr. Blake observed plaintiff's blunt affect and "rather dysphoric" mood. Id. His Depakote dose was increased to 1000mg. Id.

In early October 1998, plaintiff reported medication side effects (nausea, hives, and a rash) and continuing hypomanic symptoms, confusion, and temper outbursts. R. 441. Depakote was discontinued in favor of Tegretol. Id. On October 19, 1998, plaintiff still had a rash but his

---

[15]The record is unclear as to why plaintiff was referred back to Dr. Blake for treatment at HIP. Dr. Blake's treatment notes merely state that Dr. Guy at Pride of Judea was "no longer able to accommodate" plaintiff after he missed two appointments in August 1998, and that plaintiff "reports [a] series of difficulties at Pride of Judea." R. 440. Plaintiff testified at his third ALJ hearing that he was referred back to Dr. Blake after being treated at Pride of Judea for four or five months because he refused to enter a mental hospital, as recommended by the Pride of Judea staff. R. 627-628, 630-631.

affect was brighter, although he reported feeling the urge to drink alcohol.  Id.  Dr. Blake increased plaintiff's Tegretol dose and prescribed Remeron to aid plaintiff's sleep.  Id.

On November 16, 1998, plaintiff reported that his mood swings had diminished and his sleep was restful.  R. 439.  However, he still felt confused and hyperactive, and had poor concentration.  Id.  Plaintiff's Tegretol dose was increased again, and the Remeron was discontinued.  Id.  When plaintiff was next seen, on December 15, 1998, he complained of impaired short-term memory and excessive sleep, but no recent mood swings.  Id.

On January 11, 1999, plaintiff reported that he had been having "severe mood swings" and felt that the Tegretol was making them worse.  R. 438.  Additionally, his sleep, memory, and concentration were impaired.  Id.  Neurontin was substituted for the Tegretol.  Id.  On January 25, 1999, Dr. Blake noted that plaintiff seemed to be responding well to the Neurontin; he felt better emotionally and his mood was more stable, with only minimal anxiety.  Id.  Plaintiff's Neurontin dose was increased.  Id.  However, on February 22, 1999, plaintiff complained of lethargy and sleep impairment.  Id.  Dr. Blake noted that these symptoms were compounded by increased psychomotor retardation.  Id.  Plaintiff had a blunt affect and his mood was depressed. Wellbutrin was added to plaintiff's medications, and his Neurontin dose was increased.  Id. Plaintiff was seen in March 1999 with a rash, which Dr. Blake believed to be a reaction to local allergens.  R. 437.  Plaintiff was referred to his primary care physician for treatment of the rash, and his Neurontin and Wellbutrin prescriptions were refilled.  Id.

On April 9, 1999, plaintiff complained of increased anxiety and agitation and reported that his sleep was very impaired.  Id.  His Wellbutrin dosage was reduced.  Id.  On May 17, 1999, plaintiff reported sleeplessness and daytime drowsiness.  Id.  His mood was generally

slightly depressed, but elevated at times; his affect was labile.  Id.  His Neurontin prescription was refilled, and the Wellbutrin was replaced with Trazodone.  Id.

Because these treatment reports were added to the administrative record in June 1999 in advance of the Appeals Council review of ALJ Nisnewitz's October 1998 unfavorable decision, Dr. Blake's May 1999 progress note is the last routine treatment report contained in the record. However, the record contains two additional reports from Dr. Blake, which were apparently submitted at plaintiff's counsel's request.

Dr. Blake completed a Mental Residual Functional Capacity Assessment on April 26, 1999.  R. 446-48.  Based on his ongoing treatment of plaintiff for bipolar disorder, Dr. Blake found that plaintiff was "markedly limited" in his ability to:

- maintain attention and concentration for extended periods,
- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance,
- work in coordination with or in proximity to others without being distracted by them,
- complete a normal workweek without interruptions from psychologically-based symptoms,
- perform at a consistent pace without an unreasonable number and length of rest periods, and
- set realistic goals or make plans independently.

Id.  Additionally, Dr. Blake found that plaintiff was "moderately limited" in his ability to:

- carry out detailed instructions,
- sustain ordinary routine without supervision,
- interact appropriately with the general public,
- get along with co-workers or peers without distracting them or exhibiting behavioral extremes,
- maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and
- respond appropriately to changes in the work setting.

Id.  Dr. Blake noted that plaintiff also had mild limitations in the areas of understanding and memory, adaption, and social interactions (e.g., limited ability to accept instructions and respond appropriately to criticism from supervisors).  Id.  In response to questions regarding episodes of deterioration or decompensation in work or work-like settings, Dr. Blake stated that plaintiff's "behavior is subject to episodes of mood alteration characterized either by grandiosity, depression, or both, and results in unpredictable inappropriate performance," and therefore his behavior and performance "tends to be inconsistent and non-compatible with gainful employment."  R. 448.

Finally, Dr. Blake submitted a supplemental letter in February 2001, confirming that plaintiff had been under his care for "bipolar disorder – hypomanic type" since March 1998 and stating that "[d]uring this time he has been psychiatr[icall]y disabled."  R. 506.  Dr. Blake also commented that plaintiff's response to treatment has been "very variable with frequent medication changes necessitated by adverse reactions."  Id.


**Inga Weil, M.D., Evaluating Psychiatrist – June 18, 1998**

In March 1998, Dr. Blake referred plaintiff to the Pride of Judea Medical Center for psychiatric treatment.  R. 443.  Plaintiff underwent psychiatric evaluation by Dr. Weil at the Pride of Judea Mental Health Center on June 18, 1998.  R. 380-382.  Dr. Weil took a complete psychiatric history, conducted a thorough mental status exam, and diagnosed plaintiff with bipolar disorder and learning disabilities.  R. 381.

Dr. Weil noted, among other things, that plaintiff did not get along well with his family and had only one friend, who was approximately twice his age.  R. 380.  She also reported that

plaintiff "is known to be violent" and, while working at a supermarket, he "threw somebody who was stealing beer and apparently he took the law into his hands." Id.

During the mental status examination, Dr. Weil observed that plaintiff joked inappropriately, acted "overfamiliar" with the examiner, and rambled to such an extent that she had "great difficulty" following him. R. 381. Based upon this examination, Dr. Weil concluded that plaintiff demonstrated flight of ideas, affected and pressured speech, profuse verbalizations, marked grandiosity and narcissism, suspiciousness of others, delusional thoughts, "ideas of reference," and hallucinations. Id. Plaintiff appeared to alternate between low self-esteem and grandiosity and shook his extremities throughout the interview. Id. Dr. Weil noted that plaintiff had a "very strange response" to questions regarding suicidal thoughts; he said he dreamed about suicide but "laughed it off." Id. Dr. Weil further observed that plaintiff had "pretty poor" judgment, borderline intelligence, "quite limited" insight, and appeared to frequently fail to understand the consequences of his actions. Id.

Dr. Weil diagnosed plaintiff with bipolar disorder, and rated his current GAF as 40. Id. A GAF of 40 indicates that plaintiff had some impairment in reality testing or communication, and/or major impairment in several areas, such as work, family relations, judgment, thinking, or mood. See "Multiaxial Assessments," DSM-IV. Significantly, this GAF rating indicates that Dr. Weil concluded that plaintiff's overall functioning level was lower than that of someone with serious symptoms (e.g., suicidal ideation, severe obsessional rituals) or serious impairment in social or occupational functioning, whose GAF rating would be between 41 and 50. Id.

Dr. Weil further observed that, in addition to bipolar disorder, plaintiff has mild brain damage and has been affected by severe psychosocial stressors, including fighting between his

parents, abusive behavior by his mother, and his mother's recent death.  Id.  She recommended that plaintiff receive a full medical workup, be referred to a "socialization group," and be treated with a mood stabilizer such as Tegretol, Depakote, or Lithium.[16]  Id.

Dr. Weil concluded that plaintiff "does not function with peers, parents, and he is unable to work."  Id.  She felt that, "if [plaintiff] can be stabilized," he could "eventually" be referred to VESID or FEGS[17] for assistance in finding a "possible low level job or, if this is not feasible, a workshop."  R. 382.

**Francine E. San Giovanni, M.D., P.C., Evaluating Psychiatrist – November 2, 1998**

Dr. San Giovannni evaluated plaintiff on November 2, 1998 for worker's compensation purposes.  R. 433-435.  She took a complete psychiatric history, reviewed plaintiff's school and mental health records, and conducted a mental status examination.  Id.  Based upon this extensive review, Dr. San Giovanni concluded that plaintiff has "a long history of emotional problems dating back to age 4" and "obviously struggled for many years with a difficult and debilitating mental condition which had a global impact on his life."  R. 433-434.  Dr. San Giovanni diagnosed plaintiff with attention-deficit hyperactivity disorder (ADHD) and an

---

[16]As noted above, plaintiff was apparently treated at Pride of Judea between June and August of 1998. However, because there are no treatment notes in the administrative record, the court is unable to determine whether Dr. Weil's recommendations were implemented.

[17]Federation Employment and Guidance Service, Inc., run by the NY Federation of Jewish Philanthropies.

adjustment disorder with depressed mood,[18] and concluded that plaintiff was "<u>Totally Disabled</u>."

R. 434-435 (emphasis in original).

Dr. San Giovanni observed that plaintiff was hyperactive ("fidgety, shaking his legs rhythmically, frequently and abruptly repositioning himself on the chair") and easily distracted. R. 434.  She assessed his mood as labile, irritable, and depressed.  <u>Id.</u>  Dr. San Giovanni noted that plaintiff spoke rapidly and "in urgent tones," "impulsively blurt[ed] out ideas or comments," and was sometimes confrontational or hostile.  <u>Id.</u>

Dr. San Giovanni expressed her opinion that plaintiff had become depressed due to his efforts to cope with chronic stressors while struggling with his "difficult and debilitating" chronic mental condition.  <u>Id.</u>  She noted that, despite being frequently disciplined for verbal altercations, plaintiff "managed... to achieve[] some measure of security and success" in his employment at Grand Union.  <u>Id.</u>  Dr. San Giovanni concluded, however, that the "new stressors" posed by plaintiff's physical injuries – "two surgeries, pain in his knees and back and a realization that physical labor would no longer be possible" – caused his depression and ADHD to worsen and become more difficult to control.  <u>Id.</u>  In summary, Dr. San Giovanni stated that:

> [Mr. Tarr] cannot get along with others, has difficulty with authority figures, short attention span, hyperactivity, verbal 'explosions,' and inability to handle criticism or correction.  His depression is characterized by low self-esteem, low frustration tolerance, inability to cope with failure or rejection.

---

[18]Adjustment disorders are characterized by "a psychological response to an identifiable stressor or stressors that results in the development of clinically significant emotional or behavioral symptoms," as indicated by "marked distress that is in excess of what would be expected given the nature of the stressor or by significant impairment in social or occupational (academic) functioning."  "Adjustment Disorders," DSM-IV.  The "predominant manifestations" of an adjustment disorder with depressed mood (DSM-IV 309.0) are "symptoms such as depressed mood, tearfulness, or feelings of hopelessness."  <u>Id.</u>

> In my opinion, he is <u>Totally Disabled</u>.  He does not have the emotional stability to engage in any type of work nor could he participate in any training programs involving academic performance.  He is too fragile to endure the process of Rehab which requires all the qualities in which he is deficient . . . and which has inevitable failures and rejections along the way.

R. 434-435.


**Wendi Fischer, Ph.D., Consulting Psychologist – February & March 1999**

Dr. Fischer met with plaintiff for two three-hour periods on February 9, 1999 and March 3, 1999.  R. 422-431.  She took a complete psychological history, reviewed plaintiff's vocational evaluations from 1993-1994 and records of his psychiatric treatment by Dr. Blake, and conducted an extensive series of tests including both subjective and objective personality assessments, measures of visual-motor integration, and short-term memory assessments.  <u>Id.</u>

Based upon these measures, Dr. Fischer confirmed plaintiff's previous diagnoses of bipolar disorder and personality disorder(s), and assigned him a GAF rating of 50.  R. 425.  A GAF of 50 indicates serious symptoms, such as suicidal ideation and severe obsessional rituals, or serious impairment in social or occupational functioning.  <u>See</u> "Multiaxial Assessment," DSM-IV.  Dr. Fischer expressed her opinion that plaintiff's psychological difficulties date back to his early childhood.  Significantly, Dr. Fischer concluded that "Mr. Tarr's symptoms of bipolar disorder are so severe and impact upon his functioning so much that he is unable to perform gainful employment."  R. 425.  Dr. Fischer also completed a mental impairment questionnaire that unequivocally indicates that plaintiff meets the criteria for Listing 12.04, Affective Disorders.  R. 426-431.

Specifically, Dr. Fischer noted that plaintiff exhibited "an elevated, expansive, and irritable mood . . . grandiosity, perfectionism, pressured speech, flight of ideas, racing thoughts, and distractibility." R. 423. He also demonstrated "a great deal of anger, hostility, and paranoid ideation concerning his father, sister, and other people." Id. Objective personality assessment via the Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-II) supported the diagnosis of bipolar disorder and suggested that plaintiff has paranoid ideation. Id. Plaintiff's responses indicated that he is emotionally labile, irritable, withdrawn, anxious, insecure, resentful, hostile, paranoid, immature, self-indulgent, passive/aggressive, and resentful of authority. Id. Plaintiff also demonstrated a low tolerance for frustration, explosive reactions to stress, poor interpersonal skills, an inability to empathize with others, poor judgment, a lack of insight and coping skills, egocentrism, and narcissism. Id.

Plaintiff's performance on visual-motor integration tests was characteristic of an individual between eight and ten years old; additionally, Dr. Fischer noted that plaintiff's responses demonstrated poor planning and organization and "an arrogant and grandiose response style." R. 424. Plaintiff also exhibited functional difficulties related to short-term memory; his short-term visual memory was at the level of a five-year old and his short-term auditory memory for meaningful information was at the level of an eleven-year old. Id.

In summary, Dr. Fischer concluded that plaintiff suffers from bipolar disorder and was in a hypomanic state at the time of her examinations. Id. She found that plaintiff was arrogant, withdrawn, and incapable of empathy; he lacked judgment, insight, and interpersonal skills; and he exhibited a low tolerance for frustration, resentment of authority, and paranoid ideation. R. 424-425. Although Dr. Fischer strongly recommended continued psychiatric and psychological

treatment, she noted that "the prognosis for alleviating his symptoms or appreciably improving his function is poor due to his inability to trust others and form a therapeutic alliance with a mental health professional."  R. 425.

Dr. Fischer also completed a Mental Impairment Questionnaire based upon her evaluations of plaintiff.  R. 426-431.  She summarized the clinical signs and symptoms underlying her diagnosis of bipolar disorder, and stated that bipolar disorder is consistent with the plaintiff's symptoms and functional limitations.  R. 426-427.  Additionally, she noted that plaintiff's condition had lasted for more than a year and his prognosis was poor, and commented that his psychiatric condition exacerbates his experience of pain due to his "poor coping skills" and "inability to deal well with frustration and stress."  R. 428.

Dr. Fischer found that plaintiff had "poor to no[]" ability to perform most of the listed abilities and aptitudes necessary for unskilled work due to his paranoid ideation and grandiosity, and "poor to no[]" ability to perform all of the listed abilities and aptitudes necessary for semi-skilled or skilled work due to his poor working memory.  R. 429-430.  With regard to the four areas of functional limitation that constitute the "paragraph B criteria" in the Mental Disorder listings at 20 C.F.R. § 404, Subpart P, Appendix 1 §§ 12.00-12.08, Dr. Fischer indicated that plaintiff's mental impairments caused him to have "marked" restrictions in the activities of daily living; "extreme" difficulties in maintaining social functioning; "constant" deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and "continual" episodes of deterioration or decompensation in work or work-like settings which cause him to withdraw or to experience exacerbation of his symptoms.  R. 431.

**Harvey Bluestone, M.D., Testifying Psychiatrist – February 14, 2001 (3rd ALJ hearing)**

Dr. Bluestone, an SSA psychiatrist, testified as a medical expert at plaintiff's third ALJ hearing, which was held on February 14, 2001 before ALJ Nisnewitz. R. 618, 685-687, 693. Dr. Bluestone stated that the reports of Dr. Blake, Dr. San Giovanni, and Dr. Fisher were, in his opinion, "substantially consistent" and provided very clear evidence that plaintiff suffered from an incapacitating bipolar disorder at the time that he was examined. R. 686-687.

In response to ALJ Nisnewitz's pointed question, Dr. Bluestone stated that the first documentation of a psychiatric condition in the record dated from March 27, 1998. R. 686. The court notes that ALJ Nisnewitz failed to ask Dr. Bluestone any questions about the 1993 and 1994 evaluations which had motivated the Appeals Council to remand the case for further consideration of the plaintiff's mental impairments, or about possible correlations between the 1993-94 evaluations and the post-1997 diagnoses of bipolar disorder. Additionally, when plaintiff's attorney attempted to question Dr. Bluestone about the likely onset date of plaintiff's bipolar disorder, the ALJ repeatedly interrupted plaintiff's attorney to insist that the medical expert's opinion about the onset date was irrelevant and would not be considered. R. 692-693.

**D.     Vocational Expert Testimony**

Vocational expert (VE) Andrew Pasternak testified at the hearing before ALJ Kahn on November 4, 2002. R. 695, 729-745. After the VE described the jobs held by plaintiff prior to his knee, back, and neck injuries, ALJ Khan presented the following profile:

> We have a gentleman who in 1992 when he stopped working was 23 years of age, and his education was that he's a high school graduate . . . you're familiar with [his work experience], and he has the following limitations. He claims . . . he had a problem with his left knee . . . a back problem, and he also claims that he has, he

suffers from, as he puts it, a bipolar condition, such as it is it's an affective
disorder. Now this gentleman has limitations in his ability to function. He has
the ability to understand, remember and carry out simple instructions, but he must
function in a low pressure environment, and perform simple repetitive tasks, and
if possible, and if possible have an opportunity not to be thrust into a social, or a –
to avoid working in a, in a crowded circumstance.

R. 731. The ALJ also stated that, based upon plaintiff's physical impairments, the hypothetical

individual would be limited to sedentary work but could sit for six hours, stand and walk for two

hours, and carry 10 pounds, or up to 15 or 20 pounds occasionally. R. 732.

The VE testified that the hypothetical individual described would be unable to perform

plaintiff's past relevant work. Id. Although the VE did not specify why he eliminated most of

plaintiff's past jobs, the court presumes that they were eliminated because they involved light,

medium, and heavy physical exertion. R. 730. The VE explained that he eliminated the one

sedentary job previously held by plaintiff, the semi-skilled position of "accounting clerk,"

because it was "just be a little bit more than simple." R. 732. The VE then stated that the

hypothetical individual would be able to perform other jobs which exist in sufficient numbers

both locally and in the national economy. R. 732-733. Specifically, this individual would be

able to perform sedentary assembly jobs and machine tending jobs, and work as a hand packer, a

jewelry sorter, and a surveillance systems monitor. Id.

During questioning by plaintiff's attorney, the VE stated that he had not reviewed the

report or RFC prepared by Dr. Wendi Fischer in 1999 (R. 422-431), the psychiatric evaluation

and recommendations prepared by Dr. A. Nahas for the SSA in 1994 (R. 164-166), or the

vocational evaluation report prepared by Leslie Monsen of the National Center for Disability

Services in 1993 (R. 413-416). R. 733, 737, 741. When asked what materials he had reviewed

in preparation for the hearing, the VE stated that he had received "the forms that [plaintiff] filled out with regard to his vocational background, his initial application for Social Security benefits . . . in which he lists some of his job things. Also some medical evidence, the Exhibit 35, some other things that they've [sic] always given just to get a picture of this gentleman." R. 744-745.

Although the ALJ sharply limited the questions that plaintiff's attorney was permitted to ask the VE regarding the various psychological and psychiatric evaluations in the record, plaintiff's attorney did ask several hypothetical questions. The VE testified that an individual whose ability to remember work-like procedures was "poor to none" "certainly could" be precluded from performing some of the jobs previously identified. R. 736. An individual whose abilities to remember work-like procedures and to maintain attention for a two-hour segment were both considered "poor to none" would be unable to perform the previously identified jobs. R. 736-737. The VE stated that "a significantly impaired ability to deal with peers" would "not necessarily" prevent an individual from performing the previously identified jobs, because "some of these jobs are very isolated, or peers could be someone of his own age group, so he could be with other people or older." R. 739. Assembly workers, for example, "are working by themselves in their particular location," and surveillance monitors usually work "by themselves or with one or two other people in a pretty isolated situation." Id. The VE clarified that the identified positions are "always" overseen by supervisors; therefore, his characterization of certain jobs as "isolated" did not mean that those workers were isolated from supervisors. R. 739-740. He also testified that, although the identified jobs do not "require" close supervision, they "can have" close supervision. R. 742. The VE was unable to say, in general, whether

assemblers, surveillance monitors, and machine tenders would "typically" be "closely monitored" by supervisors.  Id.


**STANDARDS OF REVIEW**

A.      **SSA Evaluation of Disability**

This case comes to the court for review of the Commissioner's decision that the plaintiff is not disabled.  Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is considered "disabled" if his impairment is of such severity that he is unable to perform his previous work and, given his age, education, and work experience, he is unable to engage in any other type of substantial gainful employment in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  In determining whether an individual is disabled, the Commissioner must consider both objective and subjective factors, including "objective medical facts, diagnoses or medical opinions based on such facts, subjective evidence of pain and disability testified to by the claimant or other witnesses, and the claimant's educational background, age, and work experience."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980) (citations omitted).

In order to establish disability under the Act, a claimant must prove that (1) he is unable to engage in substantial gainful activity by reason of a physical or mental impairment expected to result in death or that has lasted or could be expected to last for a continuous period of at least twelve months; and (2) the existence of such an impairment is demonstrated by medically

acceptable clinical and laboratory techniques. 42 U.S.C. §§ 423(d), 1382(a); see also Shin v.

Apfel, No. 97 Civ. 8003, 1998 U.S. Dist. LEXIS 17755 at *15-16 (S.D.N.Y. Nov. 12, 1998)

(citing cases).

　　The SSA has promulgated a five step process for evaluating disability claims. See 20

C.F.R. § 404.1520.[19]  The Second Circuit has characterized this procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in
> substantial gainful employment.  If he is not, the [Commissioner] next considers
> whether the claimant has a "severe impairment" which significantly limits his
> physical or mental ability to do basic work activities.  If the claimant suffers such
> an impairment, the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix 1 of the regulations.  If
> the claimant has such an impairment, the [Commissioner] will consider him
> disabled without considering vocational factors such as age, education, and work
> experience. . .  Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.  Finally, if the claimant is
> unable to perform his past work, the [Commissioner] then determines whether
> there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464,

467 (2d Cir. 1982) (per curiam)).  The claimant has the burden of establishing disability at the

first four steps of this analysis.  At the fifth step, however, the burden shifts to the

Commissioner, who must establish that the claimant "retains a residual functional capacity to

perform alternative substantial gainful work which exists in the national economy."  Rosa, 168

F.3d at 77; see also Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

　　In addition to this basic five-step procedure, the SSA has promulgated regulations

specifically governing the evaluation of mental impairments.  See 20 C.F.R. § 404.1520a.  These

---

[19]The regulations governing disability determinations for disability insurance benefits (DIB) and for
supplemental security income (SSI) are identical.  Citations in the remainder of this opinion are to the DIB
regulations found in Part 404 of the Social Security regulations.  For each DIB regulation located at 20 C.F.R. §
404.15xx, an analogous SSI regulation can be found at 20 C.F.R. § 416.9xx.

regulations require the SSA to utilize a "special technique" at each level in the administrative review process when a claimant suffers from one or more mental impairments. Id. This special technique is summarized on the Psychiatric Review Technique Form (PTRF). See, e.g., SSR 96-8p, 1996 SSR LEXIS 5, at *13. The regulations also require the SSA to document application of this technique on a "standard document" during initial consideration of a claim, and in its written decisions:

> The written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(1)-(2).

To determine, at step two, whether a claimant's mental impairment is "severe," the ALJ must assess the degree of functional limitation resulting from the impairment. Id. at § 416.920a(d). For this purpose, the ALJ must rate the claimant's limitations in four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[20] See id. at § 404.1520a(c)(3). Functional limitations in the first three areas are rated on a five-point scale: none, mild, moderate, marked, or extreme limitations; functional limitations in the fourth area, episodes of decompensation, are rated according to a four-point scale: none, one or two, three, or four or more episodes. See id. at § 404.1520a(c)(4). If the claimant's limitations are rated as "none" or

---

[20]Because these four functional areas are listed in Paragraph B of the mental impairment listings in 20 C.F.R. Part 404, Appendix 1, they are often referred to as the "B Criteria." See 20 C.F.R. Part 404, Appendix 1, § 12.00(C) "Assessment of Severity."

"mild" in the first three areas and "none" in the fourth area, the ALJ will conclude that the mental impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." Id. at § 404.1520a(d)(1). Otherwise, the ALJ will conclude that the mental impairment is severe.

At step three, the ALJ will consider whether the claimant's severe mental impairment meets or is equivalent to the criteria of a listed impairment. See id. at § 416.920a(d)(2). If the impairment meets or is equivalent to a listing, the ALJ will find that the claimant is disabled. If, however, the claimant is found to have a severe impairment not listed in the Appendix, the ALJ must complete the analysis at steps four and five.

To carry out steps four and five, the ALJ must assess the claimant's mental residual functional capacity (mental RFC), which is used to "determine whether the claimant can meet the mental demands of past relevant work in spite of the limiting effects of her impairment and, if not, whether the claimant can do other work, considering her remaining mental capacities and her occupational base, age, education, and work experience." Rosado v. Barnhart, 290 F. Supp. 2d 431, 437-438 (S.D.N.Y. 2003) (citing 20 C.F.R. § 416.920a(d)(3) and SSR 85-15, "Titles II and XVI: Capability to Do Other Work -- The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments," 1985 WL 56857, at *4). The SSA regulations governing assessment of a claimant's RFC are located at 20 C.F.R. § 404.1545. Social Security Ruling 96-8p further specifies that "the mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the [Psychiatric Review

Technique Form].”  SSR 96-8p, 1996 SSR LEXIS 5, at *13.  The mental RFC must address a

claimant's exertional and nonexertional limitations with regard to the “[w]ork-related mental

activities generally required by competitive, remunerative work [which] include the abilities to:

understand, carry out, and remember instructions; use judgment in making work-related

decisions; respond appropriately to supervision, co-workers and work situations; and deal with

changes in a routine work setting.”  Id. at *17.


**B.      Standard of Judicial Review**

        The court's role in reviewing decisions of the SSA is narrowly confined to assessing

whether the Commissioner applied the correct legal standards in making her determination and

whether that determination is supported by substantial evidence.  See 42 U.S.C. §§ 405(g),

1383(c); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987); Donato v. Secretary, 721 F.2d

414, 418 (2d Cir. 1983).

        The court first reviews the Commissioner's decision to determine whether she applied the

correct legal standards, before applying the substantial evidence standard.  See Tejada v. Apfel,

167 F.3d 770, 773 (2d Cir. 1999).  It is well established that the Commissioner's decision must

be reversed if she failed to apply the correct legal standards in finding that the plaintiff is not

disabled.  See, e.g., Pollard v. Halter, 377 F.3d 183, 188-89 (2d Cir. 2004); Johnson, 817 F.2d at

986 (“Where there is a reasonable basis for doubt whether the ALJ applied correct legal

principles, application of the substantial evidence standard to uphold a finding of no disability

creates an unacceptable risk that a claimant will be deprived of the right to have her disability

determination made according to the correct legal principles."); Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal.").

Next, the court examines the record to verify that the Commissioner's determination is supported by substantial evidence. Substantial evidence is defined as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citation omitted). If the Commissioner's findings and determination are supported by substantial evidence, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984) ("The court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.")).

However, administrative decisions regarding claimants' eligibility for disability benefits are "surprisingly vulnerable to judicial review," due to the Commissioner's creation – and the courts' subsequent enforcement – of various procedural obligations to which ALJs must adhere. Molina v. Barnhart, No. 04 Civ. 3201, 2005 U.S. Dist. LEXIS 17981, at *21 (S.D.N.Y. Aug. 17, 2005). An ALJ's failure to adhere to any of these regulations constitutes legal error, permitting reversal of the administrative decision. Id.; see also Toribio v. Barnhart, No. 02 Civ. 4929, 2003 U.S. Dist. LEXIS 10367, at *7 (S.D.N.Y. Jun. 28, 2003).

## DISCUSSION

The Commissioner adopted ALJ Kahn's decision that plaintiff was not disabled prior to the expiration of his insured status on March 31, 1997 as the final decision of the SSA. Because I find that ALJ Kahn committed numerous legal errors, I grant plaintiff's motion for judgment on the pleadings and reverse the Commissioner's decision. Additionally, I find that remand for further administrative proceedings would serve no purpose, because the record is sufficiently complete to compel a determination that plaintiff is disabled by the combination of his physical and mental impairments. Plaintiff has established that he suffers from a combination of severe physical and mental impairments which render him unable to perform his past relevant work. Defendant Commissioner, despite having had twelve years and four administrative hearings, has failed to bear her burden at stage five of the disability determination process to show that plaintiff retains the residual functional capacity to perform other substantial gainful activity.[21] Therefore, I find that plaintiff has been disabled within the meaning of the Act since his alleged

---

[21]In his May 27, 2004 letter to the Appeals Counsel, plaintiff's counsel argued that the ALJ's conclusion, at step three, that plaintiff's impairments were "not severe enough to meet or medically equal" one of the listed impairments was incorrect. R. 190-196. Specifically, plaintiff's counsel maintained that, if the ALJ had properly analyzed and weighed all the medical evidence in the record, he would have concluded that plaintiff's condition meets or equals the condition set forth in Listing 12.04, Affective Disorders. R. 196.

According to the regulations, Affective Disorders are mental disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Part 404, Appendix 1, § 12.04. To find plaintiff disabled under Listing 12.04, the ALJ needed to find that plaintiff had "medically documented persistence" of "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes," which resulted in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. Id. at § 12.04(A)(3) and (B).

Since ALJ Kahn appears to have concluded that plaintiff suffered from bipolar disorder prior to March 31, 1997 (R. 216), he should have evaluated whether plaintiff satisfied the requirements of Listing 12.04. However, the court is not convinced that the medical evidence on record requires the conclusion that plaintiff met the criteria of Listing 12.04 as of his alleged onset date, January 3, 1992. Therefore, the court chooses to resolve this matter based upon the Commissioner's failure to demonstrate, at step five, that plaintiff retained the functional capacity to perform substantial gainful work.

onset date of January 3, 1992, and remand this matter to the SSA solely for the calculation of benefits.

The court hardly knows where to begin in describing the numerous serious legal errors that ALJ Kahn committed in considering plaintiff's mental impairments.[22] The Appeals Council remand order explicitly instructed ALJ Kahn to:

> [E]valuate the claimant's mental impairments in accordance with the special technique described in 20 C.F.R. 404.1520a and the revised medical criteria effective September 20, 2000, and document application of the technique in the decision by providing specific findings and appropriate rationale for the revised 'B' and 'C' criteria.

R. 503. However, ALJ Khan's unfavorable decision did not even mention: (1) the SSA regulations governing evaluation of mental impairments at 20 C.F.R. § 404.1520a, (2) the special technique for evaluation of mental impairments, (3) the four broad functional areas to be assessed in determining the severity of a mental impairment, (4) what if any findings he made regarding plaintiff's exertional and/or nonexertional functional limitations resulting from his mental impairments, (5) any of the mental disorder listings in the Listing of Impairments, (6) what if any findings he made regarding the criteria for any mental disorder listings, or (7) what medical evidence or other information related to plaintiff's mental impairments he relied upon in assessing plaintiff's residual functional capacity. Thus, the court finds that ALJ Kahn did not apply the appropriate SSA regulations in determining that plaintiff was not disabled within the

---

[22]Because the dispute in this case centers on plaintiff's mental impairments, I will limit my discussion to ALJ Kahn's evaluation of plaintiff's mental impairments. However, the court notes that ALJ Khan also erroneously evaluated evidence related to plaintiff's physical condition. For example, he made no mention of an RFC evaluation completed by plaintiff's treating chiropractor, which indicates that plaintiff's inability to sit for significant periods of time may limit his ability to perform sedentary work. R. 468-474.

meaning of the Act. These errors alone would require reversal. However, ALJ Khan committed numerous other errors in assessing the evidence on record.

A.        **Evaluation of Claimant's Credibility**

ALJ Kahn's determination that the claimant was "not found to be credible" was based upon inappropriate factors. R. 217. ALJ Khan felt that plaintiff's description of his mental impairments was inconsistent with (1) the fact that plaintiff completed high school and was employed for several years, (2) the fact that plaintiff was not treated for mental illness during the relevant period, (3) plaintiff's GAF ratings (as misstated and misinterpreted by the ALJ); (4) the ALJ's assessment of plaintiff's condition during the hearing; and (5) the ALJ's opinion that plaintiff's treatment had been conservative and successful. R. 217.

Plaintiff's completion of his education (at a special education school, in settings tailored to his particular needs and limitations) and success in working for "several years" (despite several demotions and dismissals) does not contradict his assertion that he was completely disabled by the combination and interrelation of his physical and mental impairments beginning in 1992. Additionally, the mere fact that a claimant did not continue treatment does not compel the inference that his condition was not severe. See, e.g., Shaw v. Chater, 221 F.3d 126, 133 (2d Cir. 2000) ("Just because plaintiff's disability went untreated does not mean he was not disabled."). This is particularly true in the context of mental illness, and where plaintiff has suggested that he discontinued treatment because he could not afford it (R. 628, 684-685). See, e.g., Regennitter v. Comm'r of the SSA, 166 F.3d 1294, 1299-1300 (9th Cir. 1999); Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989) ("[I]t is a questionable practice to chastise one

with a mental impairment for the exercise of poor judgment in seeking rehabilitation."); Shaw, 221 F.3d at 133; Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995). The court also rejects the ALJ's other bases for discounting plaintiff's credibility. It is well-established that an ALJ may not substitute his lay opinions – about plaintiff's condition (here, based on plaintiff's demeanor at the hearing), the implications of medical evidence such as plaintiff's GAF ratings, or the appropriateness of prescribed treatments – for the opinions of medical experts. See, e.g., Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998); Pietrunti v. Dir., Office of Workers' Comp. Programs, 119 F.3d 1035, 1042 (2d Cir. 1997) ("[A]n ALJ cannot arbitrarily substitute his own judgment for competent medical evidence").

**B.**    **Evaluation of Medical Evidence Relating to Plaintiff's Mental Impairments**

ALJ Kahn erred in considering virtually every piece of medical evidence related to plaintiff's mental impairments.

*1.*    ***ALJ Ignored Relevant Evidence***

ALJ Kahn completely ignored parts of the record that were directly relevant to plaintiff's allegations of disability. For example, ALJ Khan made no reference to the mental RFC in which Dr. Blake, who had at that point been plaintiff's treating psychiatrist for over a year, evaluated plaintiff's limitations with regard to the mental abilities required to perform the basic work activities enumerated in 20 C.F.R. § 404.1521(b) and the functional limitations listed in both the Listing of Impairments (Part 404, Appendix 1) and the SSA regulations governing evaluation of mental impairments (20 C.F.R. § 404.1520a). See R. 446-448.

ALJ Khan also never mentioned and presumably did not consider the psychiatric evaluation of plaintiff conducted by Dr. Nahas on behalf of the SSA on September 23, 1994 (well within plaintiff's insured period), in which Dr. Nahas diagnosed plaintiff with an anxiety disorder and impairments of judgment, insight, and concentration; found that plaintiff "is incapable of dealing with peers;" expressed concern that plaintiff's "low frustration tolerance and explosive behavior" might hinder his vocational training; and stated that plaintiff's mental condition could deteriorate due to his physical impairments. R. 164-166. Similarly, the ALJ never mentioned examining psychiatrist Dr. Weil, who diagnosed plaintiff with bipolar disorder, learning disabilities, and mild brain damage; assessed his GAF at 40 (indicating some impairment in reality testing or communication, and/or major impairment in several areas, such as work, family relations, judgment, thinking, or mood); and concluded that plaintiff "does not function with peers, parents, and he is unable to work" in June 1998. R. 380-382.

Remand is clearly warranted where the ALJ has failed to consider relevant and probative evidence in the record. See, e.g., 20 C.F.R. § 404.1527(d); Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("The ALJ must consider the entire record. . . It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination."); Lopez v. Sec'y of Dep't of Health & Human Servs., 728 F.2d 148, 150-51 (2d Cir. 1984).

## 2.   *ALJ Mischaracterized Relevant Evidence*

Additionally, ALJ Kahn mischaracterized virtually all of the evidence in the record related to plaintiff's mental impairments, selectively citing only those portions of each report that supported his conclusion. For example, ALJ Khan reported that Dr. Jones, an educational

psychologist who evaluated plaintiff for VESID, "stated in 1993 that it was possible for the claimant to work in some type of low-pressure environment." R. 218. The court finds, however, that after describing plaintiff as hyperactive, anxious, emotionally labile, and easily irritated and diagnosing plaintiff with organic personality syndrome, Dr. Jones expressed concern that plaintiff would be unable "to cope with the demands of highly pressured competitive training or work" but concluded that "[w]ith supportive supervision, Mr. Tarr <u>might</u> be able to function adequately. . . Eventual competitive employment <u>might</u> be possible for Mr. Tarr, if appropriate placement can be found for him in a low pressure setting <u>with fairly close, supportive supervision</u>." R. 420-420A (emphasis added).

An even more blatant example of ALJ Khan's distortion of medical evidence is provided by his summary of the findings of Dr. San Giovanni, who examined plaintiff in November 1998 for Worker's Compensation. In his decision, ALJ Khan stated only that Dr. San Giovanni

> found [plaintiff] to be hyperactive and easily distracted. However, there was no evidence of any psychosis and his cognition was grossly intact. There were only 'subtle' indications of 'possible impairment.' He was diagnosed with an attention deficit/hyperactivity disorder and an adjustment disorder with depressed mood.

R. 215. The court notes that Dr. San Giovanni's three-page psychiatric report did include the following sentence: "Cognition was grossly intact but there were subtle indications of possible impairment." R. 434. However, the phrase "subtle indications of possible impairment" clearly referred <u>only</u> to cognition. <u>Id.</u> The ALJ appears to have quoted this phrase out of context to support his conclusion that plaintiff was not significantly limited by his mental disorders. The court finds that a more accurate summary of Dr. Giovanni's findings would include her assessment that plaintiff has "obviously struggled for many years with a difficult and debilitating mental condition which had a global impact on his life," and her conclusion that:

[Mr. Tarr] cannot get along with others, has difficulty with authority figures, short attention span, hyperactivity, verbal 'explosions,' and inability to handle criticism or correction. His depression is characterized by low self-esteem, low frustration tolerance, inability to cope with failure or rejection.

In my opinion, he is <u>Totally Disabled</u>. He does not have the emotional stability to engage in any type of work nor could he participate in any training programs involving academic performance. He is too fragile to endure the process of Rehab which requires all the qualities in which he is deficient . . . and which has inevitable failures and rejections along the way.

R. 433, 434-435 (emphasis in original). Such mischaracterizations of the record clearly warrant reversal. <u>See, e.g.</u>, <u>Pacheco v. Barnhart</u>, No. 03-CV-3235, 2004 U.S. Dist. LEXIS 10865, at *11 (E.D.N.Y. Jun. 14, 2004) (quoting <u>Fiorello v. Heckler</u>, 725 F.2d 174, 175-76 (2d Cir. 1983) ("[A]n ALJ cannot 'pick and choose evidence in the record that supports his conclusions.'")); <u>Smith v. Apfel</u>, 69 F. Supp. 2d 370, 379 (N.D.N.Y. 1999); <u>Hartnett v. Apfel</u>, 21 F. Supp. 2d 217, 223 (E.D.N.Y. 1998) (reversing where the ALJ repeatedly mischaracterized evidence and appeared to have "relied upon his own oversimplified version of events.").

## 3.   *ALJ Incorrectly Discounted the Opinion of Plaintiff's Treating Physician*

In general, the SSA gives special deference to the opinions of a claimant's treating physicians. The treating physician rule requires an ALJ to give controlling weight to a treating physician's opinion regarding the nature and severity of a claimant's impairments if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with other substantial evidence in the record. <u>See</u> 20 C.F.R. § 416.927(d)(2); <u>Shaw</u>, 221 F.3d at 134; <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998). Because the treating physician has developed a relationship with the claimant over time and has the benefit of a longitudinal view of the claimant's condition and progress, the treating physician's opinion is considered more valuable than the opinions of consulting physicians, who

may have examined the claimant once, and testifying physicians, who may never have examined the claimant. See Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) ("What is valuable about the perspective of the treating physician -- what distinguishes him from the examining physician and from the ALJ -- is his opportunity to develop an informed opinion as to the physical status of a patient."); Schisler v. Heckler, 787 F.2d 76, 85 (2d Cir. 1986). If the ALJ decides not to give controlling weight to a treating physician's opinion, he must consider the following factors in weighing the evidence: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Clark, 143 F.3d at 118 (citing 20 C.F.R. § 404.1527).

In this case, the ALJ erroneously discounted the medical opinion of plaintiff's treating psychiatrist, Dr. Blake.[23] ALJ Khan apparently accepted Dr. Blake's conclusion that plaintiff suffers from bipolar disorder.[24] R. 216. However, he inappropriately rejected Dr. Blake's clinical observations and either rejected or ignored Dr. Blake's assessment of plaintiff's work-related mental limitations.[25] ALJ Khan cited three reasons for dismissing Dr. Blake's opinion:

---

[23]The court notes that ALJ Kahn inconsistently identified various individuals as "treating" and "consulting" physicians. For example, ALJ Kahn initially stated that Dr. Blake "examined [plaintiff] on a consultative basis," but later in the same paragraph noted that Dr. Blake treated plaintiff on a monthly basis for three years. R. 216. Similarly, the ALJ at one point classified Dr. Fischer, a consulting psychiatrist who examined plaintiff twice, and Dr. San Giovanni, a consulting psychiatrist who examined plaintiff once, as "treating physicians." R. 218.

[24]ALJ Kahn states in his decision that "[t]he medical evidence indicates that the claimant has Bi-Polar Disorder. . ." R. 216. However, it is unclear how the ALJ arrived at this conclusion since he dismissed the opinions of all the experts who diagnosed plaintiff with bipolar disorder (Dr. Blake, Dr. Weil, and Dr. Fischer). The court is forced to conclude that ALJ Kahn accepted these experts' diagnoses, but dismissed their assessments of the severity of plaintiff's condition and his resulting functional limitations.

[25]Although ALJ Kahn summarized Dr. Blake's initial evaluation of plaintiff, he never mentioned Dr. Blake's progress notes (R. 437-441) or the mental RFC that Dr. Blake completed after treating plaintiff for over a year (R. 446-448). R. 216.

(1) Dr. Blake's opinion was "not supported by objective findings;" (2) Dr. Blake's assessment of plaintiff's condition was "inconsistent with his additional conclusion that the claimant's GAF was between 55 and 65, which is consistent with an ability to function in a workplace setting;" and (3) Dr. Blake's findings had only "limited probative value" because Dr. Blake did not treat plaintiff until March 1998, approximately one year after plaintiff's insured status expired.  R. 217.  The court finds that the three rationales cited by the ALJ are incorrect, and concludes that Dr. Blake's expert medical opinion should have been given controlling weight.

i.      **Dr. Blake's Opinion Was Well-Supported by Acceptable Techniques**

ALJ Khan erred in concluding that Dr. Blake's findings were "not supported by objective findings."[26]  Id.  As described above, a treating source's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 416.927(d)(2).  "Medically acceptable" techniques clearly include clinical techniques such as mental status examinations, as well as laboratory diagnostic procedures such as psychological tests.  See, e.g., 20 C.F.R. §§ 404.1513(b)(2), 404.1528(b) and (c).  Similarly, the SSA regulations indicate that "objective medical evidence" of mental impairments includes "medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. . . shown by observable facts that can be medically described and evaluated."  20 C.F.R. §§ 404.1529(a), 404.1528(b).  It is clear from the record that both Dr. Blake's diagnosis of plaintiff's condition and his assessment

---

[26]The court notes that the ALJ similarly erred in concluding that consulting psychologist Dr. Fischer's opinion "lacks adequate support in terms of objective mental status findings."  R. 218.  In fact, Dr. Fischer's opinion was based upon extensive mental status examinations and a full battery of psychological tests, including the Minnesota Multiphasic Personality Inventory, the Bender Gestalt Test, the Developmental Test of Visual-Motor Integration, the Auditory Discrimination Test, and the Stanford-Binet Intelligence Scale.  R. 424-425.

of plaintiff's functional limitations were based upon acceptable clinical techniques, including an extensive analysis of plaintiff's mental health history and regular mental status examinations. See R. 437-448.

### ii. Dr. Blake's Findings Were Internally Consistent

ALJ Khan also erred in viewing Dr. Blake's findings as internally inconsistent. The sole inconsistency identified by the ALJ was his impression that Dr. Blake's opinion that plaintiff was disabled was inconsistent with Dr. Blake's assignment of a GAF rating "between 55 and 65," which the ALJ believed to be "consistent with an ability to function in a workplace setting." R. 217. The court first notes that Dr. Blake assessed plaintiff's GAF as 55 at the time of his initial examination of plaintiff in March 1998; the GAF of 65 noted on the same page reflects Dr. Blake's estimate of plaintiff's highest level of functioning within the preceding year. R. 443. Second, the court notes that a GAF rating of 55 generally reflects moderate symptoms and/or moderate difficulty in social or occupational functioning. See supra, note 12. While a GAF rating of 55, alone, would not provide sufficient evidence to support a finding of disability, the fact that an individual is currently experiencing "moderate difficulties" in social and occupational functioning is not inconsistent with the conclusion that an individual is unable to perform substantial gainful work. The ALJ's view that a GAF rating of 55 is consistent with an ability to function in a workplace is "not the overwhelmingly compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion." Shaw, 221 F.3d at 134-135 (citing Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 862 (2d Cir. 1990)).

### iii.     Post-Insured Period Evidence is Relevant

Finally, ALJ Khan erred in dismissing Dr. Blake's opinion as to the severity of plaintiff's condition based on the fact that Dr. Blake did not treat plaintiff prior to the expiration of his insured status.

The Second Circuit has repeatedly observed that "evidence bearing upon an applicant's condition subsequent to the date upon which the [insured status] requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the [expiration of insured status] or may identify additional impairments which could reasonably be presumed to have been present." Pollard, 377 F.3d at 193-194 (quoting Lisa v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 40, 44 (2d Cir. 1991)); Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) ("[A] diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment."). Medical evidence and diagnoses from periods subsequent to the expiration of insured status have been found to be especially valuable with regard to conditions that evade easy diagnosis (see, e.g., Wagner, 906 F.2d at 862 (hemoplegic migraine)) and psychiatric conditions such as bipolar disorder, which are primarily diagnosed based upon a longitudinal history (see, e.g., Halliday v. United States, 315 U.S. 94, 98 (U.S. 1942) (finding disability based upon a diagnosis made fifteen years after expiration of insured status because:

> While it is true that total and permanent disability prior to the expiration of the insurance contract must be established, evidence as to petitioner's conduct and condition during the ensuing years is certainly relevant. It is a commonplace that one's state of mind is not always discernible in immediate events and appearances, and that its measurement must often await a slow unfolding. This difficulty of diagnosis and the essential charity of ordinary men may frequently combine to delay the frank recognition of a diseased mind. Moreover, the totality and particularly the permanence of the disability as of 1920 are susceptible of no

better proof than that to be found in petitioner's personal history for the ensuing 15 years.)).

It is well-established that the treating physician rule applies to retrospective diagnoses – diagnoses relating to a prior time period during which the diagnosing physician may or may not have been a treating source – as well as contemporaneous diagnoses. Therefore, a retrospective diagnosis by a treating physician is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence. See, e.g., Martinez v. Massanari, 242 F. Supp. 2d 372, 377 (S.D.N.Y. 2003) (citing Shaw, 221 F.3d at 133; Perez, 77 F.3d at 48; Wagner, 906 F.2d at 861-62); Campbell v. Barnhart, 178 F. Supp. 2d 123, 134-136 (D. Conn. 2001).

The court notes that Dr. Blake's diagnosis is not explicitly retrospective; that is, Dr. Blake does not state that he believes plaintiff was incapacitated by bipolar disorder as of the alleged onset date. However, because bipolar disorder can only be diagnosed based upon a patient's history of cycling periods of depression and mania, a diagnosis of bipolar disorder is necessarily retrospective.[27] When Dr. Blake diagnosed plaintiff with bipolar disorder in March 1998, he did so based upon plaintiff's description of alternating periods of "mood instability in which he [was] either severely depressed or hypomanic" during the preceding years. R. 442. Therefore, the court finds that Dr. Blake effectively concluded that plaintiff suffered from bipolar disorder prior to the expiration of his insured status. This conclusion is strongly supported by the general characteristics of bipolar disorder. The American Psychiatric

---

[27]The National Institute of Mental Health explains that, "[l]ike other mental illnesses, bipolar disorder cannot yet be identified physiologically – for example, through a blood test or a brain scan. Therefore, a diagnosis of bipolar disorder is made on the basis of symptoms, course of illness, and, when available, family history." National Institute of Mental Health, Bipolar Disorder (2001), available at http://www.nimh.nih.gov/publicat/bipolar.cfm.

Association, for example, describes bipolar disorder as "an episodic, lifelong illness with a variable course." Practice Guideline for the Treatment of Patients with Bipolar Disorder 16 (2d ed. 2002), available at http://www.psych.org/psych_pract/treatg/pg/bipolar_revisebook_index.cfm. Experts agree that bipolar disorder typically develops in late adolescence or early adulthood. See, e.g., id. at 18. The onset of bipolar disorder tends to occur at an earlier age for individuals whose first-degree biological relatives have mood disorders. See "Mood Disorders," DSM-IV. Notably, plaintiff's mother was manic depressive and his father had an affective disorder. R. 422, 442.

As the Second Circuit explained in Dousewicz, a diagnosis made after the expiration of insured status "must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of [an] impairment prior to [expiration of insured status]." 646 F.2d at 774. As discussed above, Dr. Blake's opinion was unquestionably predicated on medically accepted clinical diagnostic techniques. Considered in light of the entire record, Dr. Blake's evaluation and diagnosis clearly establish that plaintiff suffered from disabling bipolar disorder as of his alleged onset date.

Dr. Blake's diagnosis and assessment of plaintiff's functional limitations are strongly supported by other medical evidence in the record. First, Dr. Blake's assessment is confirmed by the psychiatric and psychological examinations conducted by Dr. Weil in June 1998, Dr. San Giovanni in November 1998, and Dr. Fischer in March 1999. ALJ Khan erroneously discounted or ignored these medical opinions because the experts examined plaintiff after his insured status expired. R. 218. However, the court finds that these opinions, like that of Dr. Blake, are highly

relevant because they "may disclose the severity and continuity of impairments existing before the [expiration of insured status] or may identify additional impairments which could reasonably be presumed to have been present."  Pollard, 377 F.3d at 193-194.

As SSA medical expert Dr. Bluestone testified during the third ALJ hearing, there is "substantial agreement" between the reports of Dr. Blake and consulting experts Dr. San Giovanni and Dr. Fischer, all of which "speak very clearly" to an incapacitating bipolar disorder.[28]  R. 687.  These reports also provide strong support for the conclusion that plaintiff's mental impairments date back to his alleged onset date.  Dr. San Giovanni, for example, observed that plaintiff "obviously struggled for many years with a difficult and debilitating mental condition which had a global impact on his life – family relationships, school performance, social relationships were all impaired to varying degrees."  R. 434.  She specifically concluded that plaintiff's physical injuries and the resulting pain and physical limitations exacerbated his mental condition and made it more difficult to control.  Id.  Dr. Fischer similarly noted that plaintiff "has a history of psychological difficulties, including emotional lability, mood instability, poor impulse control, and difficulties with interpersonal relations, that date back to his childhood" and were so severe that he was placed under psychiatric care and medication at age six.  R. 422.

Contrary to the ALJ's assertion, the court finds that these retrospective diagnoses and assessments are supported – rather than contradicted – by other evidence in the record.  First, plaintiff's testimony regarding his mental condition, his social relationships (or lack thereof), and his school and work history provides strong support both for Dr. Blake's diagnosis and for the

_____

[28]Dr. Bluestone, like the ALJ, seems to have been unaware of the report by psychiatrist Dr. Weil, who examined plaintiff in June 1998.  R. 380-382.

48

conclusion that plaintiff's mental impairment predated his alleged onset date.  For example, plaintiff testified in February 2001 that his emotional problems "only got worse" between age 14 and when he began seeing Dr. Blake.  R. 684-685.  Plaintiff also testified, in August 1998, that when he began taking medication prescribed for his knees and back in early 1996, "my head started to clear. . . and my hyperactivity started going down.  Also certain things that were running through my head were going away.  It was. . . an unforeseen benefit, so I thought if I go see a psychiatrist maybe it's something psychological after all and maybe they could help."  R. 546-547.  This testimony illustrates that plaintiff suffered from both hyperactivity and racing thoughts or hallucinations prior to 1996.  Similarly, plaintiff's testimony suggests that he experienced manic episodes as early as 1991.  When asked whether he had ever had problems with his temper at work, plaintiff testified in August 1998 that he remembered "a few incidences where I've had to throw people.  A couple of them went through windows. . .  Six times to my recollection."  R. 559.  Plaintiff elaborated on these incidents in February 2001:  "He was trying – he was a 17-year-old kid trying to steal beer.  I stopped him, he took a poke at me, I grabbed him, I picked him up off the floor, and I threw him through a window. . . I think it was 1991. . . it's not the first time that it happened.  Usually that's what usually happened. . ."  R. 668-671.

Dr. Blake's diagnosis is also supported by the 1993 and 1994 evaluations conducted on behalf of VESID.  In his decision, ALJ Kahn stated that these evaluations "contradicted" Dr. Blake's diagnosis.  R. 218.  The court notes initially that, if these evaluations were actually contradictory, the factors listed at 20 C.F.R. § 404.1527 suggest that the opinion of a treating specialist who saw the plaintiff on a regular basis should be given greater weight than the opinions of non-specialists who saw plaintiff once.  More importantly, however, the ALJ

mischaracterized the 1993 and 1994 evaluations. Although these evaluators did not diagnose plaintiff with bipolar disorder, they consistently (a) diagnosed plaintiff with mental impairments; (b) identified symptoms and behaviors that are consistent with a diagnosis of bipolar disorder; (c) expressed concerns about plaintiff's ability to cope with work situations; and (d) strongly recommended that plaintiff seek psychiatric and/or psychological treatment. Notably, none of the medical experts who evaluated plaintiff's mental health concluded that he was not suffering from a mental impairment.

All of the medical experts who evaluated plaintiff's mental health during his insured period diagnosed him with mental impairments; their assessments differed only with regard to the specific mental disorders diagnosed. Courts have previously observed that "[t]he mere fact that several physicians have diagnosed a particular claimant's mental condition differently does not compel a conclusion that the claimant is not suffering from a mental impairment." Benedict v. Heckler, 593 F. Supp. 755, 758-759 (E.D.N.Y. 1984); see also Rivera v. Schweiker, 560 F. Supp. 1091, 1096 (S.D.N.Y. 1982) (noting that a claimant may be found disabled by a mental impairment "even if there are disagreements regarding diagnosis. . . it is not unusual to find, in the same individual, signs and test results associated with several pathological conditions"). In this case, plaintiff was repeatedly diagnosed with mental disorders characterized by symptoms and clinical signs that are similar to bipolar disorder. For example, Dr. Berczeller diagnosed plaintiff with intermittent explosive disorder and paranoid personality disorder (R. 412), and Dr. Nahas diagnosed plaintiff with anxiety disorder, not otherwise specified, and attention deficit/hyperactivity disorder (R. 165). The DSM-IV criteria for all four of those conditions caution that the symptoms and signs characteristic of these mental disorders may also be

accounted for by a manic or mood disorder (such as bipolar disorder).  See supra notes 6, 7, 10 and 11.

Similarly, the medical experts who evaluated plaintiff in 1993 and 1994 observed symptoms and clinical signs that are consistent with a diagnosis of bipolar disorder.  Dr. Berczeller concluded that plaintiff was hyperactive, argumentative, paranoid, anti-social, unable to tolerate pressure, and prone to verbal explosion.  R. 412.  Dr. Jones determined that plaintiff was hyperactive, excessively talkative, anxious, emotionally labile, easily irritated, unable to cope with pressure, and would require close, supportive supervision in any work setting.  R. 420-421.  Dr. Nahas described plaintiff as angry, suspicious, prone to explosive behavior, emotionally labile, anxious, and "incapable of dealing with peers."  R. 164-166.  All these evaluators expressed concern that plaintiff's aggression, explosive behavior, low frustration tolerance, and inability to cope with pressure would impede his ability to work.  R. 412, 420-420A, 166.

### iv. Dr. Blake's Opinion Should Have Been Given Controlling Weight

Where, as here, "there is no medical testimony to rebut the retrospective opinion of the treating physician, nor is there overwhelmingly compelling non-medical evidence to the contrary," the treating physician's retrospective opinion is binding on the ALJ.  Campbell, 178 F. Supp. 2d at 135 (citing Wagner, 906 F.2d at 862; Gercke v. Chater, 907 F. Supp. 51, 52 (E.D.N.Y. 1995)).  Therefore, the court concludes that ALJ Kahn erred in failing to give controlling weight to Dr. Blake's opinion regarding the "nature and severity of claimant's impairments."  20 C.F.R. § 416.927(d)(2).

**C.**　　**Evaluation of Plaintiff's Residual Functional Capacity (RFC)**

At the fourth step of the sequential analysis, the ALJ is required to assess the plaintiff's residual functional capacity (RFC), including his mental RFC. 20 C.F.R. §§ 404.1520a(d)(3), 404.1545. ALJ Khan completely failed to evaluate plaintiff's mental RFC and document his findings as required by 20 C.F.R. § 404.1520a. Instead, the ALJ merely stated that, prior to the expiration of his insured status, plaintiff retained the RFC to perform "sedentary work reduced by additional limitations" and noted that plaintiff's ability to "perform all or substantially all of the requirements of [sedentary] work is impeded by additional exertional and/or non-exertional limitations." R. 218, 219. ALJ Khan did not list or describe the "additional exertional and/or non-exertional limitations" that would, in his opinion, restrict plaintiff's ability to perform sedentary work. Based upon the hypothetical posed to the VE during plaintiff's hearing, the court assumes that ALJ Kahn concluded that plaintiff's bipolar condition imposed the following nonexertional limitations: plaintiff "must function in a low pressure environment. . . perform simple repetitive tasks, and. . . avoid working [] in a crowded circumstance." R. 731.

The court finds that this assessment of plaintiff's vocational limitations is woefully inadequate. As a result of his mischaracterization of the medical evidence, incorrect determination that plaintiff was not credible, and failure to give controlling weight to the opinion of plaintiff's treating physician, ALJ Khan disregarded the overwhelming evidence in the record which demonstrates that plaintiff's mental impairment imposed numerous additional nonexertional limitations.

Based on the evaluations from 1993 and 1994 alone, ALJ Khan should have identified that plaintiff "has difficulties adjusting to working situations" (Dr. Berczeller, R. 412); "is prone

to at least verbal explosions" and exhibits "explosive behavior" (Id., Dr. Nahas, R. 164-165);

requires "close, supportive supervision" (Dr. Jones, R. 420A); is "incapable of dealing with

peers" (Dr. Nahas, R. 165); and has impaired judgment, insight, and concentration (Id.).

Additionally, the mental RFC completed by plaintiff's treating psychiatrist documents marked

limitations in plaintiff's ability to:

- maintain attention and concentration for extended periods,
- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance,
- work in coordination with or in proximity to others without being distracted by them,
- complete a normal workweek without interruptions from psychologically-based symptoms,
- perform at a consistent pace without an unreasonable number and length of rest periods, and
- set realistic goals or make plans independently;

and moderate limitations in plaintiff's ability to:

- carry out detailed instructions,
- sustain ordinary routine without supervision,
- interact appropriately with the general public,
- get along with co-workers or peers without distracting them or exhibiting behavioral extremes,
- maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and
- respond appropriately to changes in the work setting.

R. 446-448. ALJ Khan should have considered all of these limitations in formulating plaintiff's

RFC.


**D.      Evaluation of Plaintiff's Ability to Perform Past Relevant Work & Other Work**

At step four of the analysis, the SSA considers whether the claimant retains the ability to

perform his past relevant work. Based upon the extremely limited assessment of plaintiff's

nonexertional limitations presented by ALJ Khan, the VE testified that plaintiff could not

perform any of his former jobs.  R. 732.  Accordingly, ALJ Khan concluded that plaintiff had

successfully established that, during his insured period, he suffered from severe impairments

which rendered him unable to perform his past relevant work.  R. 218.[29]

The ALJ then proceeded to assess, at step five, whether plaintiff could perform other

work, given his RFC, age, education, and work experience.  See 20 C.F.R. § 404.1560(c).  It is

well-established that the burden of proof shifts from the claimant to the Commissioner at the

fifth step of the sequential analysis:  "While the burden is on the claimant to prove that he is

disabled within the meaning of the Social Security Act, . . . if the claimant shows that his

impairment renders him unable to perform his past work, the burden then shifts to the

Commissioner to show there is other gainful work in the national economy that the claimant

could perform."  Balsamo, 142 F.3d at 80.  Having reached step five of the analysis, the

Commissioner must "provide evidence that demonstrates that other work exists in substantial

numbers in the national economy that [plaintiff] can do, given [his] residual functional capacity

and vocational factors" before she may conclude that plaintiff is not disabled within the meaning

of the Social Security Act.  20 C.F.R. § 404.1560(c)(2).

When a claimant's impairments narrow the range of sedentary work he can perform, the

SSA must consider the extent to which the sedentary "occupational base" is "eroded" by the

---

[29]The court notes that ALJ Khan stated in his written opinion that "claimant's prior jobs all ranged from light to medium in terms of exertional requirements.  Consequently, it must be found that he cannot return to his past relevant work."  R. 218.  However, during the hearing, the VE testified that "[i]n between stints, I would characterize him as an accounting clerk. . . which is a sedentary position."  R. 730.  Based upon the hypothetical posed by the ALJ, the VE stated that he "would rule out all of the [plaintiff's prior jobs], including the accounting clerk. . . I think it would be just a little bit more than simple."  R. 732.  The court therefore finds that, although the ALJ misstated the rationale in his written decision, he correctly concluded that plaintiff was unable to perform his past relevant work.

claimant's exertional and nonexertional limitations. SSR 96-9p, "Titles II and XVI: Determining Capability to Do Other Work–Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work," 1996 SSR LEXIS 6, at *11-12. The SSA has determined that the following mental activities are generally required by competitive, remunerative work:

- Understanding, remembering, and carrying out simple instructions.
- Making judgments that are commensurate with the functions of unskilled work--i.e., simple work-related decisions.
- Responding appropriately to supervision, co-workers and usual work situations.
- Dealing with changes in a routine work setting.

Id. at *25-26. Social Security Ruling 96-9p explains that "[a] substantial loss of ability to meet any one of [these] basic work-related activities on a sustained basis. . . will substantially erode the unskilled sedentary occupational base and would justify a finding of disability."[30] Id. at *25. A limited ability to meet these demands may or may not substantially erode the sedentary occupational base; the testimony of a vocational expert is usually required to assess whether a claimant's particular skills and limitations would allow him to perform substantial gainful work. Id. at *26.

ALJ Khan did obtain the testimony of a vocational expert in this case. However, a VE's testimony can only be credited if the hypothetical upon which the VE bases his opinion "present[s] the full extent of the claimant's impairments and provide[s] a sound basis for the expert's testimony." Flint v. Barnhart, No. 04-CV-6567, 2005 U.S. Dist. LEXIS 27323, *23-25

---

[30]The court notes that even the 1993 and 1994 evaluations alone demonstrate that plaintiff has, at a minimum, a "substantial loss" of ability to respond appropriately to supervision, co-workers, and usual work situations. See, e.g. Dr. Nahas' evaluation, R. 165 (concluding that plaintiff is "incapable of dealing with peers"); Ms. Monsen's evaluation, R. 415 (noting that plaintiff "argued and insisted he was correct" when a supervisor pointed out his mistakes); Dr. Berczeller's evaluation, R. 412 (observing that plaintiff "has difficulties adjusting to work situations").

(W.D.N.Y., Oct. 11, 2005) (citing De Leon v. Secretary of Health and Human Services, 734 F.2d 930 (2d Cir. 1984)); see also Lugo v. Chater, 932 F. Supp. 497, 504 (S.D.N.Y. 1996); Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981) ("The vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job.").

The hypothetical that ALJ Khan posed to the VE during plaintiff's hearing was clearly inadequate, because it did not describe many of the limitations articulated by the medical experts who evaluated plaintiff's mental condition. Because this hypothetical did not present the full extent of plaintiff's impairments, it cannot be found to have provided a sound basis for the VE's testimony. As a result, the VE's responses were not fully informed and cannot be used as substantial support for the conclusion that plaintiff is capable of doing other substantial work. The Commissioner has therefore failed to meet her burden of demonstrating that plaintiff retains the functional capacity to perform work that exists in substantial numbers in the national economy. See 20 C.F.R. § 404.1560(c)(2).

**E.      Appropriate Remedy**

Remand is appropriate when the Commissioner failed to correctly apply the law and the regulations. See Rosa, 168 F.3d at 82-83. When "the administrative record contains gaps" and "further development of the evidence is appropriate," courts generally remand a case to the Commissioner for further administrative proceedings. Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004); see also Rosa, 168 F.3d at 83 (finding remand for further administrative proceedings appropriate when "further findings would so plainly help to assure the proper disposition of [the]

claim."). However, when a court finds "no apparent basis to conclude that a more complete record might support the Commissioner's decision, [it may] opt[] simply to remand for a calculation of benefits." Id.

Remand solely for the calculation of benefits is particularly appropriate when the Commissioner has failed to meet her burden of proving that the plaintiff is able to work at step five of the prescribed sequential analysis. See, e.g., Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000) ("Because the Commissioner failed to introduce evidence sufficient to sustain his burden on the fifth step in the case sub judice, remand for the sole purpose of calculating an award of benefits is mandated."); Balsamo, 142 F.3d at 82 (finding that, where reversal is based on "the Commissioner's failure to sustain her burden of adducing evidence of the claimant's capability of gainful employment" and the Commissioner's finding as to the claimant's residual functional capacity is not supported by substantial evidence, "no purpose would be served by our remanding the case for rehearing unless the Commissioner could offer additional evidence.").

In the instant case, remand with instructions to obtain additional psychiatric or psychological opinions regarding plaintiff's bipolar disorder would be useless as the record clearly indicates that plaintiff has been disabled within the meaning of the Act by the combination of his physical and mental impairments since his alleged onset date, January 3, 1992. The medical evidence in the record establishes that, at all points since January 3, 1992, plaintiff has had extreme difficulties with at least two of the four basic mental abilities required by even simple unskilled sedentary work. Specifically, plaintiff is substantially limited in both his ability to respond appropriately to supervision, co-workers and usual work situations, and his ability to deal with changes in a routine work setting. See SSR 96-9p, 1996 SSR LEXIS 6, at

*25-26.  Because it is clear that plaintiff has been disabled within the meaning of the Act since

his alleged onset date, a remand for additional administrative procedures would serve no

purpose.  Additionally, "remand [for further proceedings], potentially followed by another

appeal, could well delay the payment of benefits to which [the claimant] appears to be entitled

for still further years."  Balsamo, 142 F.2d at 82 (citing Carroll v. Sec'y of Health and Human

Servs., 705 F.2d 638, 644 (2d Cir. 1983)).

Furthermore, to justify a remand to admit new evidence, the Commissioner must

establish "good cause for the failure to incorporate such evidence into the record in a prior

proceeding."  Carroll, 705 F.2d at 644 ("Absent a showing by the [Commissioner] of good cause

for a remand, the present case would be a good one in which to carry out Congress' mandate to

foreshorten the painfully slow process by which disability determinations are made.").  The

Commissioner cannot possibly show good cause for her failure, during the twelve years that

plaintiff's claim has been pending, to obtain further medical evidence regarding plaintiff's

mental health between 1992 and 1997.  At any point in the last eight years, any one of the three

ALJs to whom the Appeals Council remanded plaintiff's claim, with instructions to consider

plaintiff's residual functional capacity based upon his mental impairments, could have further

developed the record by requesting additional information from the four physicians who

examined plaintiff in 1998 or 1999 and diagnosed plaintiff with disabling bipolar disorder.

A court should order payment of benefits only where the record contains "persuasive

proof of disability" and remand for further evidentiary proceedings would serve no further

purpose.  Parker, 626 F.2d at 235; Carroll, 705 F.2d at 644.  Because I find that the

Commissioner failed to prove that plaintiff retains the residual capacity to perform other work

and that the record clearly demonstrates that plaintiff is disabled within the meaning of the Act, remand solely for calculation of benefits is appropriate in this case.

**CONCLUSION**

For foregoing reasons, defendant's motion for judgment on the pleadings is denied, plaintiff's cross-motion is granted, and the Commissioner's decision is reversed. The case is remanded to the Commissioner solely for the calculation of benefits.

The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

\_\_\s\_____
Allyne R. Ross
United States District Judge

Dated: March 31, 2006
      Brooklyn, New York

SERVICE LIST:

*Counsel for Plaintiff:*
Charles E. Binder
Binder and Binder
215 Park Avenue South
6th Floor
New York, NY 10003

*Counsel for Defendant:*
Kathleen Anne Mahoney
United States Attorneys Office
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, NY 11201

Leslie A. Ramirez-Fisher
United States Attorney
Eastern District of New York
One Pierrepomt Plaza
Brooklyn, NY 11201